## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF AN APPLICATION OF THE UNITED STATES OF AMERICA FOR:<br><br>A CRIMINAL COMPLAINT AND ARREST WARRANT FOR ALBERTO NUNEZ;<br><br>AUTHORIZATION TO SEARCH 1 TRI TOWN DRIVE, BUILDING #1, APARTMENT #109, LUNENBURG, MASSACHUSETTS (TARGET PREMISES 1);<br><br>AUTHORIZATION TO SEARCH 28 MUSKET DRIVE, BUILDING #4, APARTMENT #C-7, LEOMINSTER, MASSACHUSETTS (TARGET PREMISES 2);<br><br>AUTHORIZATION TO SEARCH CIBAO HISPANIC MARKET, 1151 MAIN STREET, FITCHBURG, MASSACHUSETTS (TARGET PREMISES 3); and<br><br>AUTHORIZATION TO SEARCH 52 GERARD DRIVE, APARTMENT F, FITCHBURG, MASSACHUSETTS (TARGET PREMISES 4) | M.J. Nos.  20-6132-MPK<br>20-6133-MPK<br>20-6134-MPK<br>20-6135-MPK<br>20-6136-MPK<br><br><br><br>**FILED UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR
## A CRIMINAL COMPLAINT, ARREST WARRANT, AND SEARCH WARRANTS

I, Bradley Gullicksrud, being sworn, state:

### Introduction and Agent Background

1.      I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") since November 2014, and am currently assigned to the Boston Field Office, Organized Crime Drug Enforcement Task Force (OCDETF) Strike Force. I am a "federal law enforcement officer" as defined in Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a government agent who is engaged in enforcing the criminal laws of the United States and within a category of officers authorized by the Attorney General to request a search warrant.

1

2.      Prior to my current employment with the FBI, I was employed by the Aurora, Colorado Police Department for approximately ten years.  During that time, I worked as a Patrol Officer, Vice and Narcotics Investigator, and as a Task Force Officer assigned to the FBI Denver Metro Gang Task Force.

3.      During my career in law enforcement, I have received training and gained experience related to a variety of criminal activities.  In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug trafficking conspiracies.  In the course of conducting criminal investigations, I have employed the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short-term and long-term narcotics investigations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and toll record data; conducting court-authorized electronic surveillance; and preparing and executing search warrants that resulted in substantial seizures of narcotics, firearms, and other contraband.

4.      I am currently investigating Alberto Nunez, (hereinafter, "NUNEZ"), and other members of NUNEZ's drug trafficking organization (hereinafter, the "NUNEZ DTO"), for conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846, as well as distribution of and possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1) (hereinafter, the "TARGET OFFENSES").

## Purpose of the Affidavit

5.      I submit this affidavit for three reasons.  First, I submit it in support of an application for a criminal complaint charging that from at least on or about November 2019 through on or about February 2020, ALBERTO NUNEZ conspired with others known and unknown, to distribute and possess with intent to distribute cocaine base and fentanyl, in violation of Title 21, United States Code, Section 846.

6.      Second, I submit this affidavit in support of the government's motion to detain NUNEZ pending trial.  Based on the information below, NUNEZ presents a danger to the community and a risk of flight.

7.      Third, I submit this affidavit in support of applications for four search warrants for the following locations:

  a.  1 Tri Town Drive, Building #1, Apartment #109, Lunenburg, Massachusetts (TARGET PREMISES 1).  Based on the investigation to date, agents have identified this location as ▇▇▇▇▇ residence.  In addition, I believe NUNEZ also resides at this location, at least a part-time basis.  Based on intercepted calls, surveillance, and drug seizures, which will be described below, I believe NUNEZ stores and sells drugs at this location.  A complete description, of the property to be searched is set forth in Attachment A-1, which is attached hereto and incorporated by reference herein.

  b.  28 Musket Drive, building #4, Apartment C-7, Leominster, Massachusetts (TARGET PREMISES 2).  Based on the investigation to date, agents have identified this location as the residence of ▇▇▇▇▇▇ ▇▇▇▇▇▇  Based on intercepted calls, surveillance, and drug seizures, which will be described below, I believe NUNEZ stores and sells drugs at this location.  A complete description of the property to be searched is set forth in Attachment A-2, which is attached hereto and incorporated by reference herein.

  c.  Cibao Hispanic Market, 1151 Main Street, Fitchburg, Massachusetts (TARGET PREMISES 3).  Based on the investigation to date, agents know that NUNEZ is a co-owner of this location.  Based on intercepted calls, surveillance, and drug seizures, which will be described below, I believe NUNEZ stores and sells drugs at this location.  A complete description of

the property to be searched is set forth in Attachment A-3, which is attached hereto and incorporated by reference herein.

d. 52 Gerard Drive, Apartment F, Fitchburg, Massachusetts (TARGET PREMISES 4). Based on the investigation to date, agents have identified this location as NUNEZ' primary residence. Based on intercepted calls, surveillance, and drug seizures, which will be described below, I believe NUNEZ stores and sells drugs at this location. A complete description of the property to be searched is set forth in Attachment A-4, which is attached hereto and incorporated by reference herein.

(Collectively, the "TARGET PREMISES").

8. The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested search warrants and does not set forth all of my knowledge about this matter.

9. I submit that there is probable cause to believe that NUNEZ has violated Title 21, United States Code, Section 846, and that the locations to be searched contain records and other evidence of the TARGET OFFENSES. As will be discussed below, I submit that there is probable cause to believe that evidence of the TARGET OFFENSES, as set forth in Attachments B-1, B-2, B-3, and B-4 will be located at the properties to be searched, as described in Attachments A-1, A-2, A-3, and A-4.

## Probable Cause to Believe That a Federal Crime was Committed

### *Investigation Background*

10. Since September 2018, members of the FBI Boston Strike Force have been conducting an investigation of drug trafficking organizations operating in Fitchburg, Massachusetts and the surrounding communities. The investigation was initially focused on Pedro Baez (hereinafter, "PEDRO") and the drug trafficking organization he led (hereinafter the, "BAEZ DTO"). The BAEZ DTO was responsible for distributing a heroin and fentanyl mixture, cocaine,

and crack cocaine to approximately 20 customers throughout the Fitchburg, Massachusetts area. On November 21, 2019, agents conducted search warrants and arrested PEDRO, his son Anthony Baez (hereinafter, "ANTHONY"), and six other members of the DTO. The investigation of the BAEZ DTO resulted in the seizure of approximately 1.7 kilograms of a heroin and fentanyl mixture, 1.5 kilograms of cocaine, and 20 grams of crack cocaine.

11.     During the BAEZ DTO investigation, United States District Court Judges for the District of Massachusetts authorized interception of wire and electronic communications of phones used by PEDRO and other members of the BAEZ DTO. Through those interceptions, and other investigative methods, agents identified NUNEZ as a suspected supplier of a heroin and fentanyl mixture to ▮▮▮▮▮▮ (hereinafter, "▮▮▮▮▮ who in turn supplied the heroin and fentanyl mixture to ▮▮▮▮▮ (hereinafter, "▮▮▮▮▮ who in turn supplied the heroin and fentanyl mixture to PEDRO and ANTHONY. On January 23, 2020, United States District Court Judge Allison D. Burroughs, the District of Massachusetts authorized the initial interception of wire and electronic communications to and from telephone number ▮▮▮▮▮ (hereinafter, "Target Telephone 11"). Based on a combination of surveillance and intercepted calls, Target Telephone 11 is used by NUNEZ. *See* 19-91283-WGY. Through the interception of Target Telephone 11, agents have learned that NUNEZ uses the TARGET PREMISES to distribute fentanyl and crack cocaine throughout Fitchburg and the surrounding communities. NUNEZ and the other Target Subjects distribute these drugs mostly to drug users, but some of the customers redistribute the drugs to others as well. Based on seizures from, and statements made by, customers of NUNEZ, intercepted calls, and conversations with local law enforcement officials, I believe NUNEZ typically sells bags of both crack cocaine and fentanyl for $40 each, and that each bag typically contains approximately half a gram of narcotics. As described below, agents have

seized crack cocaine and fentanyl from some of the customers after meeting with NUNEZ at the TARGET PREMISES.

### TARGET PREMISES 1

*NUNEZ Supplied Suspected Customer* ▇▇▇▇▇▇ *with Drugs at TARGET PREMISES 1*

12.     On February 2, 2020, agents intercepted a call over Target Telephone 11 between NUNEZ and ▇▇▇▇▇▇ (hereinafter, "▇▇▇▇▇▇ a suspected drug customer, during which NUNEZ asked ▇▇▇▇▇ "How many?" and ▇▇▇▇▇ replied "One."   NUNEZ instructed ▇▇▇▇▇ to go to "the house in Lunenburg…109" and ▇▇▇▇▇ replied that he was on his way.

13.     Based on this call, together with a subsequent drug seizure from ▇▇▇▇▇▇ I believe ▇▇▇▇▇ ordered a single bag of crack cocaine and NUNEZ directed ▇▇▇▇▇ to go to TARGET PREMISES 1 to purchase the crack cocaine.  I believe NUNEZ was referring to TARGET PREMISES 1 when he said "the house in Lunenburg," because agents have observed NUNEZ entering and exiting the building on several occasions.  The primary occupant of the residence is NUNEZ's girlfriend, ▇▇▇▇▇▇ but NUNEZ visits TARGET PREMISES 1 on a near daily basis.  Additionally, as described below in the CIBAO SPANISH MARKET section, agents know ▇▇▇▇▇ to be a crack cocaine customer of NUNEZ, because agents have seized crack cocaine from ▇▇▇▇▇ after making similar calls and meeting with NUNEZ.  Based on the foregoing, I believe ▇▇▇▇▇ met with NUNEZ at TARGET PREMISES 1 to purchase crack cocaine.

*NUNEZ Supplied Drugs to* ▇▇▇▇▇▇ *Inside TARGET PREMISES 1*

14.     On February 8, 2020, agents intercepted a call on Target Telephone 11 between NUNEZ and ▇▇▇▇▇▇ (hereinafter, "▇▇▇▇▇ a suspected drug customer.  NUNEZ

told [REDACTED] to go to "Lunenburg for Tri Town" and described the address as being near "Donnelly's." Donnelly's Tavern is located just outside the entrance of TARGET PREMISES 1. NUNEZ asked [REDACTED] "How many?" The call ended before [REDACTED] replied, but approximately 13 minutes later agents intercepted another call between NUNEZ and [REDACTED] [REDACTED] said he had arrived and NUNEZ told [REDACTED] to come inside. [REDACTED] asked for the apartment number and NUNEZ replied, "109."

15.     Based on the investigation, and the intercepted calls described above, I believe [REDACTED] purchased drugs from NUNEZ inside TARGET PREMISES 1 during this meeting. One week earlier, on February 1, 2020, agents intercepted calls over Target Telephone 11 between NUNEZ and [REDACTED] indicating that they would meet at the Post Office in Lunenburg. Agents conducted surveillance, and conducted a traffic stop of [REDACTED] after [REDACTED] was observed meeting with NUNEZ briefly at the Post Office parking lot. After being advised of his rights, [REDACTED] admitted to having just purchased two bags of crack cocaine from "Albert." [REDACTED] provided the two bags of crack cocaine to law enforcement. Agents performed a field test on the suspected crack cocaine, and the substance tested positive for the presence of cocaine base (crack cocaine).

### *NUNEZ Instructed [REDACTED] to Prepare Drugs at TARGET PREMISES 1*

16.     On February 9, 2020, agents intercepted calls over Target Telephone 11 indicating that NUNEZ would meet with [REDACTED] (hereinafter, "[REDACTED] and [REDACTED] LNU (hereinafter, "[REDACTED] Based on the investigation, I believe both [REDACTED] and [REDACTED] are drug customers of NUNEZ. After the calls with [REDACTED] and [REDACTED] agents intercepted a call over Target Telephone 11 between NUNEZ and [REDACTED] The following conversation, translated by Spanish speaking monitors, occurred during the call:

| NUNEZ: | Where are you now? |
|---|---|
| ▓▓▓▓▓ | I'm home and where are you? |
| NUNEZ: | Go…No, No I'm here leaving from ▓▓▓ house.  Check what it is that you have there and what it was that I gave you…Do me a favor. |
| ▓▓▓▓▓ | Ok. |
| NUNEZ: | Check if you have two butters there. |
| ▓▓▓▓▓ | No, where is it? |
| NUNEZ: | There isn't any? |
| ▓▓▓▓▓ | No. |
| NUNEZ: | Well do you know where my jacket is? |
| ▓▓▓▓▓ | I don't think that there's one there…I think. |
| NUNEZ: | In the black one!  In the black one so that you go check there, because I'll be there in a couple of minutes so that you make time. |
| ▓▓▓▓▓ | What is it that you want? |
| NUNEZ: | I need two butters, you should have to make at least five or six.  I need the small package of rice and two butters. |
| ▓▓▓▓▓ | Alright. |
| NUNEZ: | But be ready because I'll be there in 2-3 minutes. |

17.     Minutes later, agents intercepted calls over Target Telephone 11 between NUNEZ and ▓▓▓▓ and between NUNEZ and ▓▓▓ during which he told each of them that he was on his way to meet them.  Based on previous calls with ▓▓▓▓ I believe that ▓▓▓▓ buys both crack cocaine and heroin from NUNEZ.  On February 7, 2020, ▓▓▓▓ sent NUNEZ a text message complaining about the poor quality of the "brown" he sold her.  Based on my training and experience, I know that "brown" is slang for heroin.  ▓▓▓▓ has also called NUNEZ to

request "both" from NUNEZ.  Based on the calls and the investigation, I believe that "both" meant

both heroin and crack cocaine.  As will be described in more detail below, I believe ▆▆▆ is a crack

cocaine customer of NUNEZ.  Based on the call with ▆▆▆▆▆▆ I believe NUNEZ was

leaving from ▆▆▆▆▆ house (TARGET PREMISES 2) to make drug deliveries to ▆▆▆▆▆

and ▆▆▆ I believe NUNEZ confirmed that ▆▆▆▆▆▆ was at home, TARGET PREMISES

1, and asked that ▆▆▆▆▆ bring packages of heroin ("butter") and crack cocaine ("small

package of rice") from the apartment to NUNEZ when he arrived in the parking lot.

### ▆▆▆▆▆▆ *Sold Suspected Crack Cocaine to* ▆▆▆▆▆ *at TARGET PREMISES 1*

18.     On February 13, 2020, agents intercepted a call over Target Telephone 11 between

NUNEZ and ▆▆▆▆▆ during which ▆▆▆▆▆ told NUNEZ he wanted to see him, and NUNEZ

asked, "How many?" ▆▆▆▆▆ responded, "Three."  Approximately twenty minutes later, agents

intercepted another call over Target Telephone 11 between NUNEZ and ▆▆▆▆▆ during which

NUNEZ instructed ▆▆▆▆▆ to "go to Lunenburg, to the house."  A short time later, agents

intercepted a call over Target Telephone 11 between NUNEZ and ▆▆▆▆▆ during which

NUNEZ said "Portuguese" was going to stop by over there.  NUNEZ added that "Portuguese"

would "ring the bell in a bit" and that he wanted "three bucks."

19.     Approximately fifteen minutes later, agents intercepted a call over Target

Telephone 11 between ▆▆▆▆▆ NUNEZ, during which ▆▆▆▆▆ told NUNEZ he was at his

own house.  NUNEZ told ▆▆▆▆▆ that he wanted ▆▆▆▆▆ to go to his house, and he specified

apartment "109" in the condo near "Donnelly's." ▆▆▆▆▆ confirmed that he remembered

meeting NUNEZ at the same location before, and said he was on his way.  Agents conducted

surveillance at TARGET PREMISES 1, and observed ▆▆▆▆▆ arrive in his red Jeep.  As they

drove by the location, agents observed ▆▆▆▆▆ exit his Jeep and ring the doorbell at the front

door for TARGET PREMISES 1.  Approximately two minutes later, agents observed ▮▮▮▮▮▮▮ return to his Jeep and depart the area.

20.     Based on these calls and observations, I believe ▮▮▮▮▮▮▮ ("Portuguese") purchased three bags of crack cocaine from ▮▮▮▮▮▮▮ at TARGET PREMISES 1.  I know that NUNEZ was unavailable to personally sell the drugs to ▮▮▮▮▮▮ at that time, because agents were conducting surveillance of NUNEZ and observed him driving toward Fitchburg from the Connecticut border.

### TARGET PREISES 2

*NUNEZ Sold* ▮▮▮▮▮▮▮▮▮▮ *Suspected Fentanyl at TARGET PREMISES 2*

21.     On February 8, 2020, agents intercepted a call over Target Telephone 11 between NUNEZ and ▮▮▮▮▮▮▮▮ (hereinafter, "▮▮▮▮▮▮▮ a suspected drug customer, during which ▮▮▮▮▮▮ asked NUNEZ if she could come to see him.  NUNEZ agreed, and ▮▮▮▮▮▮▮ asked where she should go.  NUNEZ told her that he would call back.  Less than a minute later agents intercepted an outgoing text message on Target Telephone 11 to ▮▮▮▮▮▮ which read, "28 Musket Drive."  Approximately twenty minutes later, agents conducting surveillance at TARGET PREMISES 2 observed ▮▮▮▮▮▮ arrive in a Toyota Camry.  At the same time, agents intercepted another call over Target Telephone 11 from ▮▮▮▮▮▮ to NUNEZ, during which ▮▮▮▮▮▮▮ told NUNEZ she had arrived.

22.     Approximately five minutes later, agents observed NUNEZ walk from TARGET PREMISES 2 to ▮▮▮▮▮▮ vehicle.  NUNEZ entered the front passenger seat of ▮▮▮▮▮▮ vehicle.  Less than a minute later, NUNEZ exited the vehicle and walked back toward TARGET PREMISES 2.  Agents followed ▮▮▮▮▮▮ as she departed from TARGET PREMISES 2 and observed her stop at a parking lot a short distance away.  A trooper approached ▮▮▮▮▮▮▮

vehicle and observed that  was preparing to smoke what appeared to be fentanyl/heroin. The trooper stopped ▭ from smoking the drugs, and after being advised of her rights, ▭ admitted to having just purchased a bag of heroin from a Hispanic male for $40.

23.     Agents conducted a field test on the substance seized from ▭ and it tested positive for the presence of "U-47700."  U-47700 is an opioid analgesic listed as a Schedule I Controlled Substance.  Based on my training and experience, I believe the U-47700 seized from ▭ likely also contains heroin and/or fentanyl.  Agents sent the substance to the DEA Northeast Laboratory for further testing.  The results are pending.

*NUNEZ Suspected of Selling Crack Cocaine to ▭ at TARGET PREMISES 2*

24.     Based on interceptions over Target Telephone 11, I believe ▭ is a regular drug customer of NUNEZ.  ▭ typically contacts NUNEZ multiple times a week requesting to meet. The conversations between NUNEZ and ▭ are almost all under one minute in duration, and typically consist only of coordinating a place to meet location, and NUNEZ asking ▭ "How many?"  Based on the calls and surveillance, ▭ has met with NUNEZ to purchase drugs at multiple locations, including TARGET PREMISES 2.

25.     On February 6, 2020, agents intercepted a number of calls and text messages over Target Telephone 11 between NUNEZ and ▭ during which they discussed meeting.  Although they did not discuss a specific drug or amount, based on the investigation, I believe ▭ was meeting with NUNEZ to purchase crack cocaine.  NUNEZ asked ▭ to meet him in "Leominster on Musket Drive," and said he would text ▭ the address.  Less than one minute later, agents intercepted a text message over Target Telephone 11 from NUNEZ to ▭ stating, "28 Musket Drive leominster."   Approximately twenty minutes later, agents intercepted a call over Target Telephone 11, during which ▭ called NUNEZ to tell him that he arrived.  At the same time,

agents conducting surveillance observed ▆▆ arrive at TARGET PREMISES 2 in a Ford F-150 truck. During the call, NUNEZ told ▆▆ to give him two minutes.

26.     Approximately five minutes later, agents intercepted another call over Target Telephone 11, during which NUNEZ instructed ▆▆ to go to "apartment C-7." ▆▆ called NUNEZ back a few minutes later, because the front door of 28 MUSKET DRIVE was locked. NUNEZ confirmed ▆▆ was at the right location and instructed ▆▆ to use the side door. Less than a minute later, ▆▆ called NUNEZ again to confirm if NUNEZ was in "A, B, or C." NUNEZ said he was in "C." Less than ten minutes later, agents observed ▆▆ departing from TARGET PREMISES 2, and conducted a traffic stop of ▆▆ a short distance away from TARGET PREMISES 2. ▆▆ consented to a search of his person and vehicle, but no narcotics were located. Based on other calls and the nature of this meeting, I believe that ▆▆ purchased drugs from NUNEZ at TARGET PREMISES 2, but was able to hide them from the trooper conducting the consent search of ▆▆ and his vehicle. The trooper noted that ▆▆ vehicle was extremely cluttered and it would not have been difficult to conceal drugs inside the vehicle.

## TARGET PREMISES 3

*NUNEZ Sold Crack Cocaine to* ▆▆ *Inside TARGET PREMISES 3*

27.     TARGET PREMISES 3 is a convenience store business. Based on a search of the corporate database records maintained by the Massachusetts Secretary of State, NUNEZ and ▆▆ are co-owners of TARGET PREMISES 3.

28.     On February 8, 2020, agents intercepted a call over Target Telephone 11 between NUNEZ and ▆▆ As described above in the TARGET PREMISES 1 section, ▆▆ is a suspected crack cocaine customer of NUNEZ. During the call, ▆▆ said, "I need three," and NUNEZ replied, "Ok, I'm in Fitchburg." Approximately fifteen minutes later,

agents intercepted another call between NUNEZ and ▭ over Target Telephone 11, during which ▭ asked NUNEZ where to go and NUNEZ replied, "Come to the store now." Shortly thereafter, agents conducting surveillance at TARGET PREMISES 3 observed ▭ arrive in a Toyota Camry. At approximately the same time, agents intercepted a call over Target Telephone 11, during which ▭ called NUNEZ to change the order to "two" and say that he was walking inside.

29.    Less than a minute later, agents observed ▭ exit TARGET PREMISES 3 and leave in the Toyota Camry. Agents maintained surveillance, and observed ▭ park beside a Ford Focus parked at a Dunkin Donuts parking lot. Agents observed ▭ conduct what appeared to be a hand to hand exchange with the driver of a Ford Focus, operated by ▭ (hereinafter, "▭ As ▭ attempted to drive out of the parking lot, Massachusetts State Police troopers approached the vehicles. Agents observed ▭ throw items out his window before being directed back into the parking lot by the troopers.

30.    After being advised of his rights, ▭ admitted to throwing two bags of crack cocaine out of his vehicle window when attempting to exit the parking lot. The troopers walked with ▭ to the street where ▭ threw the drugs and recovered two plastic bags containing suspected crack cocaine. ▭ admitted that he had just purchased the crack cocaine from ▭ After being advised of his rights, ▭ admitted that he purchased the two bags of crack cocaine from the CIBAO HISPANIC MARKET, TARGET PREMISES 3. ▭ said he re-sold the crack cocaine to ▭ to make some extra money. Agents conducted a field test of the suspected crack cocaine, and it tested positive for the presence of cocaine base.

31.     Despite being stopped by agents on February 8, 2020, [REDACTED] has continued to meet with NUNEZ to purchase drugs, including at TARGET PREMISES 3.  On February 15, 2020, agents intercepted a call over Target Telephone 11 between NUNEZ and [REDACTED] during which [REDACTED] asked if NUNEZ could bring "it" down to him.  NUNEZ declined and said he was in Fitchburg.  Approximately twenty minutes later, [REDACTED] called NUNEZ back and asked where to go.  NUNEZ replied, "Go to the store now."  [REDACTED] sounded reluctant to go to the store, but agreed to do so.  Approximately twenty minutes later, [REDACTED] called NUNEZ and said he would be arriving in one minute and that he wanted "two."  NUNEZ told [REDACTED] to go back to the bathroom.

32.     Based on these calls I believe [REDACTED] purchased two bags of crack cocaine from NUNEZ near the bathroom inside TARGET PREMISES 3.  I believe [REDACTED] was reluctant to complete the deal at TARGET PREMISES 3 because of the seizure on February 8, 2020, but decided to go because NUNEZ was unwilling to deliver the drugs to him.

*NUNEZ Sold Crack Cocaine to [REDACTED] Inside TARGET PREMISES 3*

33.     On February 15, 2020, agents intercepted a call over Target Telephone 11 between NUNEZ and [REDACTED] (hereinafter, [REDACTED]).  [REDACTED] asked if he could see NUNEZ for "three."  NUNEZ agreed, and instructed [REDACTED] to call when he was there.  Approximately fifteen minutes later, NUNEZ called [REDACTED] and told [REDACTED] to "go to the store," but to "be careful."  Agents conducted surveillance at TARGET PREMISES 3, and observed [REDACTED] arrive in a Ford Ranger truck arrive about 30 minutes later.  [REDACTED] went inside the TARGET PREMISES 3 for a short period of time and then departed in his truck.

34.     Agents maintained surveillance of [REDACTED] and conducted a traffic stop with a Fitchburg Police Officer a short distance away.  [REDACTED] told the officer that he had just

purchased some "crack and weed."  The officer located and seized three bags of suspected crack cocaine from inside ████████ sock.  No marijuana was found on ████████ or inside his vehicle. The officer conducted a presumptive test on the suspected crack cocaine.  The drugs tested positive for the presence of cocaine or cocaine base.  The drugs are currently in Fitchburg Police custody but will be collected by the FBI and submitted to the DEA Northeast Laboratory for further testing.

35.     Approximately four hours after the traffic stop, agents intercepted a call from ████████ to NUNEZ over Target Telephone 11.  During the call, ████████ told NUNEZ that he should "stop" because people were following him (████████).  ████████ said, "They're in your store, one man, I say he's undercover."  NUNEZ simply replied, "Ok."  As described below, despite the warning from ████████ NUNEZ continued to direct drug customers to CIBAO HISPANIC MARKET.

*NUNEZ Instructs ████████ to Meet ████████ at TARGET PREMISES 3*

36.     Agents have intercepted numerous communications over Target Telephone 11, which indicate that NUNEZ personally sells drugs from inside TARGET PREMISES 3.  In addition, agents have also intercepted a number of communications indicating that NUNEZ stores drugs at TARGET PREMISES 3.  At various times when NUNEZ was unavailable, he directed drug customers to meet with ████████ at TARGET PREMISES 3.

37.     On February 1, 2020, agents intercepted a call over Target Telephone 11 between NUNEZ and telephone number ████████ (hereinafter, the ████ Number"), during which NUNEZ spoke with an unknown male (hereinafter, "████████  Based on multiple intercepted calls and text messages over Target Telephone 11, I believe ████████ is a heroin and crack cocaine customer of NUNEZ.  During the call intercepted on February 1, 2020, ████████ asked NUNEZ for "four."  NUNEZ said he did not have a vehicle, but instructed ████████ to "go to ████ she is

there."  Based on this call, I believe that  wanted four bags of drugs ("four"), and that NUNEZ instructed       to get the drugs from       ("      Approximately one minute later, agents intercepted another call over Target Telephone 11, between NUNEZ and       during which NUNEZ said, "She's at the store."       asked, "Does she have something over there?"  NUNEZ replied, "Yeah, she'll take you to the back."  Based on these calls, and because there were no other calls later that day, I believe       met with       at TARGET PREMISES 3 to purchase four bags of either heroin or crack cocaine.

       38.    On February 13, 2020, agents intercepted a call over Target Telephone 11 between NUNEZ and       during which       told NUNEZ that he would need "three butter and two hard ones" in about an hour.  NUNEZ told       that he was driving, and instructed       to "Go to where    is."  At the time of this call, agents were conducting physical surveillance of NUNEZ as he was driving back toward Fitchburg from the Connecticut border.  Based on my training and experience, I know that the term "butter" is a common slang term for heroin and that "hard" is a common slang term for crack cocaine.  Because agents have never observed drug deals occur at       residence, or intercepted any communications indicating that customers meet       anywhere other than TARGET PREMISES 3, I believe       met with       at TARGET PREMISES 3 to purchase three bags of heroin and two bags of crack cocaine.

### TARGET PREMISES 4

#### *NUNEZ Sold Suspected Drugs to    at TARGET PREMISES 4*

       39.    On February 5, 2020, agents intercepted a call over Target Telephone 11 between NUNEZ and       during which NUNEZ agreed to meet with       and said he was in Fitchburg.       asked, "Fitchburg where?  At the store?"  NUNEZ replied, "No, in my house, in Fitchburg."

Approximately 25 minutes later, ████ called NUNEZ to confirm the address, and NUNEZ said "52 Gerard Drive." ████ asked which apartment and NUNEZ replied, "F." ████ said he was there and would be knocking on NUNEZ's door.

40.    Based on these calls, I believe ████ requested two bags of drugs from NUNEZ. I believe ████ is a crack cocaine customer based on other calls intercepted between NUNEZ and ████ including later the same night. About four hours after the calls described above, agents intercepted a call over Target Telephone 11, during which ████ asked NUNEZ for another "two." NUNEZ agreed to meet ████ in about thirty minutes at ████ residence. Approximately thirty minutes later, ████ called NUNEZ and told NUNEZ to come back, because NUNEZ gave him "powder." NUNEZ apologized and said he got confused. Based on these calls, I believe NUNEZ is a crack cocaine customer of NUNEZ, and that NUNEZ had accidentally sold ████ fentanyl. I believe NUNEZ accidentally gave ████ fentanyl, as opposed to powder cocaine, because over the course of the investigation, there is no evidence that NUNEZ sells powder cocaine. All of the seizures and intercepted calls indicate that NUNEZ sells heroin/fentanyl ("butter" or "brown") and crack cocaine. To date, there is no evidence that NUNEZ sells powder cocaine.

41.    Based on the investigation, including the intercepted calls described above during which NUNEZ refers to TARGET PREMISES 4 as his "house," I believe TARGET PREMISES 4 is the residence of NUNEZ.

*NUNEZ Traveled to TARGET PREMISES 4 Before Selling Four Bags of Fentanyl to* ████

42.    On February 12, 2020, agents intercepted multiple calls over Target Telephone 11 between NUNEZ and ████ During those calls, ████ and NUNEZ agreed to meet in the parking lot of a Market Basket grocery store. Agents conducting surveillance of NUNEZ observed NUNEZ drive into the parking lot where ████ was already waiting. At the same

time, agents intercepted a call between NUNEZ and ▓▓▓▓ over Target Telephone 11, during which ▓▓▓▓ confirmed that she saw NUNEZ in the lot, and NUNEZ told her to come to his truck. ▓▓▓▓ told NUNEZ that she wanted "four." NUNEZ replied that he only had two with him, but that it was not a problem because his house in Fitchburg was close by. NUNEZ instructed ▓▓▓▓ to follow him.

43.     Agents conducted surveillance of ▓▓▓▓ following NUNEZ to TARGET PREMISES 4. ▓▓▓▓ parked her vehicle behind NUNEZ's vehicle, and waited in her vehicle while NUNEZ and an unknown female entered the building. About five minutes later, agents observed NUNEZ exit the building at 52 GERARD DRIVE and walk directly over to ▓▓▓▓ vehicle. NUNEZ made a hand to hand exchange with ▓▓▓▓ through her vehicle window. ▓▓▓▓ departed from TARGET PREMISES 4, and agents followed her until she parked at a CVS store. ▓▓▓▓ did not make any other stops prior to parking at the CVS store. Agents approached ▓▓▓▓ and seized four bags of suspected fentanyl from her. Agents performed a field test on the suspected fentanyl, and it tested positive for the presence of fentanyl.

### *NUNEZ Met with* ▓▓▓▓ *at TARGET PREMISES 4*

44.     On February 15, 2020, agents intercepted a call on Target Telephone 11 between NUNEZ and ▓▓▓▓ (hereinafter, "▓▓▓▓ At this time agents are unsure if ▓▓▓▓ is a heroin or crack cocaine customer of NUNEZ but ▓▓▓▓ but believe he is a regular drug customer who typically requests three or four bags at a time. During the call, ▓▓▓▓ simply said "Five" and added, "They better be big." A short time later, NUNEZ called ▓▓▓▓ and told him to go to the same place he went the day before.

45.     Agents conducting surveillance observed NUNEZ arrive at the Mohawk Club in Shirley, Massachusetts, and park beside ▓▓▓▓ who was waiting in a red Jeep, which is

registered in ▇▇▇▇▇▇▇ name.  Agents observed NUNEZ and ▇▇▇▇▇▇▇ briefly meet before both departing from the parking lot.  Agents attempted to follow ▇▇▇▇▇ but lost sight of him for about five minutes before observing him driving back toward the Mohawk Club. Agents conducted a traffic stop of ▇▇▇▇▇ but no drugs were located on ▇▇▇▇▇ or inside his vehicle.

46.    Later that same night, agents intercepted another call over Target Telephone 11 between NUNEZ and ▇▇▇▇▇▇▇  The first portion of the call was not recorded, but when the recording started someone on the call said "police."  ▇▇▇▇▇▇ asked permission to go to NUNEZ's house and NUNEZ agreed.  Approximately twenty minutes later ▇▇▇▇▇ called NUNEZ to confirm NUNEZ's apartment.  ▇▇▇▇▇ asked, "D or F?"  NUNEZ replied, "F, F."  Based on this call, I believe ▇▇▇▇▇ met with NUNEZ at TARGET PREMISES 4 to talk about the police stopping ▇▇▇▇▇ after they completed a drug deal earlier the same day.

47.    On February 16, 2020, agents intercepted another call over Target Telephone 11 between NUNEZ and ▇▇▇▇▇▇ during which they discussed the traffic stop.  The following conversation occurred between NUNEZ and ▇▇▇▇▇▇

| ▇▇▇▇▇▇ | You better change your phone. |
|---|---|
| NUNEZ: | Ok. |
| ▇▇▇▇▇▇ | Because you know, remember yesterday when you pulled in there was some truck going out? |
| NUNEZ: | Yeah. |
| ▇▇▇▇▇▇ | That was the guy who stopped me. |
| NUNEZ: | What guy? |
| ▇▇▇▇▇▇ | So, so they got your phone and I wouldn't be using my other phone, ya know, so you gotta change that number. |

| NUNEZ: | Ok. |
|---|---|
| ▆▆▆▆▆▆ | And be careful who you give it out to. |
| NUNEZ: | Ok. |
| ▆▆▆▆▆▆ | Cause I'm telling you right now, you know I've been around a long time, you've been around a long time, there's something going on. They stripped me, they went through my whole Jeep, everything. |
| NUNEZ: | Ok. |
| ▆▆▆▆▆▆ | So, I'm just, I'm just telling you as a heads up.  Let me know if you get another number, alright. |
| NUNEZ: | Bye. |

48.     Based on this call, I believe NUNEZ is likely to stop using Target Telephone 11 soon, and transition to his drug business to another phone.

## Drug Traffickers' Use of Residences and Cell Phones Generally

49.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of drug-traffickers' residences and locations of operation:

a.  Controlled substances.

b.  Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics.

c.  Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle

rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

d.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

e.  Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

f.  Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

g.  Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

h.  Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

i.  Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

j.  Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords and documents.

50.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice

for drug traffickers to maintain in their residences records relating to their drug trafficking activities.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.  I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

51.     Even when drug dealers store their drugs outside their residences, I know that they often will keep records relating to these offsite storage locations at their primary residence.  Such documents include rental or storage property agreements and receipts.

52.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for traffickers to conceal, at their residences or locations of operations, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances.

53.     Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds.  Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and

will use proceeds to purchase legitimate investments or expensive jewelry and precious metals.  In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

54.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes or other containers so that other individuals who are at their residence do not discover these materials.

55.     Many drug dealers receive their drugs through overnight parcels and keep mailing labels and airbills both used and unused in their residence for future use.  Additionally, such drug traffickers often send the proceeds of their drug sales via overnight delivery, Western Union, and/or wire to their suppliers in order to pay for a continuing supply of drugs.  Such individuals will often maintain records of these transactions for a period of time in case there is a later dispute concerning what funds were transmitted and when.

56.     During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the TARGET OFFENSES.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.  Furthermore, records of residency

linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping. Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility. For example, a person involved in the trade of illegal drug is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills. These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

57.     Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators. In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residences. Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences. As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

58.     Based upon my knowledge, training and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio

signals.  These telephones send signals through networks of transmitter/receivers called "cells,"
enabling communication with other wireless telephones or traditional "land line" telephones.  A
wireless telephone usually contains a "call log," which records the telephone number, date, and
time of calls made to and from the phone.  In addition to enabling voice communications, wireless
telephones now offer a broad range of capabilities.  These capabilities include, but are not limited
to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing
text messages and email; taking, sending, receiving, and storing still photographs and moving
video; storing and playing back audio files; storing dates, appointments, and other information on
personal calendars; and accessing and downloading information from the Internet.  Wireless
telephones may also include global positioning system ("GPS") technology for determining the
location of the device.  Based on my training and experience, I know that many cellular telephones
have the capabilities described above.

59.    Search and seizure of devices containing this information will provide information
relating to coconspirators and accomplices.  I know, based upon my training and experience, as
well as consultation with other investigators, that individuals who sell illegal drugs typically use
cellular telephones to communicate with their suppliers, their customers, and with other
coconspirators, and that they communicate both via voice calls and via email and/or text
messaging.  I also know that persons who sell illegal drugs regularly keep records of their illegal
activities.  These records can include, but are not limited to, contact list of buyers and sellers,
ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific
controlled substances preferred by or ordered by specific customers.  Individuals engaged in drug
trafficking activities often take photographs of their closest confederates.  Records of drug
trafficking activities can be produced and maintained on paper in a tangible form and/or by

electronic means on a cellular telephone.  From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachments B-1, B-2, B-3, and B-4 on their cellular telephones.

60.    Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via the internet.  I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online.  Additionally, many cellular phones today have a GPS navigation device on the phone.  Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals.  Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

61.    Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards.  I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet.  This is true because:

        a.  Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their

electronic equipment, they can easily transfer the data from their old device to a new one.

b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

62.     The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachments B-1, B-2, B-3, and B-4. If however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

63.     Based on the foregoing, there is probable cause to believe that evidence of the commission of the TARGET OFFENSES, more specifically, the items set forth in Attachments B-1, B-2, B-3, and B-4, will be found in the Target Premises, described in Attachments A-1, A-2, A-3, and A-4.

## Conclusion

64.     Based on the foregoing, I respectfully request that the Court issue the requested criminal complaint, charging NUNEZ with conspiracy to distribute and possess with intent to distribute cocaine base and fentanyl.  I further request that NUNEZ be detained pending trial.

65.     Based upon the evidence set forth above, as well as my training and experience, I submit that there is probable cause to believe that at the TARGET PREMISES, as described in Attachments A-1, A-2, A-3, and A-4, there exists evidence, fruits, and instrumentalities of drug distribution activities, as set forth in Attachments B-1, B-2, B-3, and B-4.  Accordingly, I respectfully request that search warrants be issued for the search of the property described in Attachments A-1, A-2, A-3, and A-4, for the items detailed in Attachments B-1, B-2, B-3, and B-4B.

66.     Disclosure of the contents of the application, affidavit, complaint, arrest warrant, and search warrants could compromise and jeopardize the ongoing investigation.  For that reason, I request that the application, affidavit, and search warrants be sealed until further order of the Court.

Respectfully submitted,

Bradley Gullicksrud
Federal Bureau of Investigation

Subscribed and sworn to before me on February __18th, 2020.

Hon. M. Page Kelley
United States Magistrate Judge

## ATTACHMENT A-1

## TARGET PREMISES 1

The premises located at 1 Tri Town Drive, building #1, apartment #109, Lunenburg, Massachusetts, is part of the Tri Town Landing at Lunenburg apartment complex. The front door is red in color and is covered by a white, pillar supported awning. There is a red "1" affixed to the center of the awning. Apartment #109 is located on the first floor of the building and a "109" is affixed to a wooden placard to the left of the apartment entry door. Photographs of the property are below:



**ATTACHMENT B-1**
**(Items to be seized from TARGET PREMISES 1)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances); and 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances) (collectively, the "TARGET OFFENSES"):

1.   Controlled substances.

2.   Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

3.   Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

4.   Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

5.   Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

6.   Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

7.   Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal

telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

8.      Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

9.      Cellular telephones used by or belonging to [REDACTED] or ALBERTO NUNEZ, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of any mobile telephone, including but not limited to:

   a.      Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

   b.      Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

   c.      Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

   d.      Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   e.      GPS data;

   f.      Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   g.      Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   h.      All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

   i.      Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

## ATTACHMENT A-2

## TARGET PREMISES 2

The premises located at 28 Musket Drive, building #4, apartment #C-7, Leominster, Massachusetts is part of the Heritage Garden Apartment complex. The front door is black in color and covered by a white awning. The address "28 Musket Drive BUILDING 4" is affixed to the front door in large white numbers and letters. The residence can also be accessed by a side door on the building. Inside the entry way of the front door are mailboxes for the apartments inside the building. The mailbox for C-7 is labeled with the last names " " Photographs of the property are below:



**ATTACHMENT B-2**
**(Items to be seized from TARGET PREMISES 2)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances); and 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances) (collectively, the "TARGET OFFENSES"):

1. Controlled substances.

2. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

3. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

4. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

5. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

6. Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

7. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility

33

and telephone bills, bank statements, credit card receipts, identification documents, and keys.

8. Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

9. Cellular telephones used by or belonging to ALBERTO NUNEZ, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of any mobile telephone, including but not limited to:

    a.    Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

    b.    Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

    c.    Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

    d.    Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

    e.    GPS data;

    f.    Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

    g.    Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

    h.    All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

    i.    Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

## ATTACHMENT A-3

## TARGET PREMISES 3

The property listed as Cibao Hispanic Market, located at 1151 Main Street, Fitchburg, Massachusetts is a convenience store business.  The store is located on the ground level of a structure that includes apartments above the business.   A business sign labeled "CIBAO HISPANIC MARKET" in blue letters is attached to the second story of the building.  The premises to be searched are limited to only the ground level business portion of the building.  See photograph of the property below:



**ATTACHMENT B-3**
**(Items to be seized from TARGET PREMISES 3)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances); and 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances) (collectively, the "TARGET OFFENSES"):

1. Controlled substances.

2. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

3. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

4. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

5. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

6. Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

7. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences,

such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

8.      Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

9.      Cellular telephones used by or belonging to ALBERTO NUNEZ and/or ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓ and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of any mobile telephone, including but not limited to:

a.      Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

b.      Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

c.      Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

d.      Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

e.      GPS data;

f.      Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

g.      Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

h.      All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i.      Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

**ATTACHMENT A-4**

**TARGET PREMISES 4**

The property located at 52 Gerard Drive, apartment F, Fitchburg, Massachusetts is part of the Forest Ridge Apartment Home complex.  The front door of the building is black in color and a gold color "52" is affixed to the center of the door.  Inside the front entry way there are mailboxes for all the apartments located inside the building.  The mailbox for apartment F has a yellow sticky note with the names "NUNEZ Y REYNOSO" attached to it.  Photographs of the property are below:





**ATTACHMENT B-4**
**(Items to be seized from TARGET PREMISES 4)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances); and 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances) (collectively, the "TARGET OFFENSES"):

1.     Controlled substances.

2.     Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

3.     Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

4.     Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

5.     Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

6.     Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

7.     Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences,

such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

8.     Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

9.     Cellular telephones used by or belonging to ALBERTO NUNEZ, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of any mobile telephone, including but not limited to:

a.     Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

b.     Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

c.     Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

d.     Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

e.     GPS data;

f.     Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

g.     Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

h.     All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i.     Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.